# FONTANO *v.* ROBBINS.

BUILDING CONTRACTS; ARBITRATION; GUARANTY.

1. Where one article of a building contract provides, that in case of dissent by either party from the award of the architects as to allowances for alterations, submission shall be had to arbitrators, and another article provides that the owner shall provide all labor and materials not included in the contract in such manner as not to delay the material progress of the work and, in event of failure so to do, thereby causing loss to the contractor, that he will reimburse the contractor for such loss, and that the amount of such loss shall be fixed and determined by the architects or by arbitration, as provided for in the first-named article, an award by the architects or by arbitrators is not a condition precedent to the maintenance by the contractor of an action against the owner for a breach of the provisions of the second article.
2. One who, with the approval of church authorities engaged in the construction of a church building, undertakes to provide the interior construction of a chapel to be connected with the church. and who, in furtherance of such undertaking, enters into a contract with another for such work, which contract provides that " the owner agrees to provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in event of the failure so to do, thereby causing loss to the contractor, agrees that he will reimburse the contractor for such loss;" thereby takes the place of the real owner for the purposes of the contract, and becomes an absolute guarantor of the necessary construction preliminary to the commencement of the other's work.

No. 1049.   Submitted May 14, 1901.   Decided June 7, 1901.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, entered upon a verdict directed by the court in an action of covenant. *Reversed.*

The COURT in its opinion stated the case as follows:

This is an action upon a contract under seal to recover the sum of $3,888.10 on account of time lost and extra ex-

penses incurred through delay caused the plaintiff in the performance of his undertaking. The contract was entered into on August 19, 1895, by the plaintiff, Primo Fontano, of Carrara, Italy, party of the first part, with the defendant, Mary Helen Carroll, now Robbins, of Howard County, Maryland, party of the second part. In consideration of the sum of $28,500, promised to be paid by the defendant, the plaintiff undertook, under the direction and to the satisfaction of certain architects, to provide all the materials and perform all the work shown in the drawings and specifications of said architects " for the interior marble finish of the Chapel of St. Anthony of Padua, in the Church of St. Matthew, Washington, D. C., including the ceiling of decorative plaster-work and the three windows of transparent alabaster all set up in place complete." The work was to be completed on or before October 1, 1896. Provision was made for the extension of the time set for completion upon certain contingencies; among them " the neglect, delay or default of the owner, or the architects, or of any other contractor," and so forth. The case turns upon the construction and application of the following articles of the contract:

" Article 3. No alterations shall be made in the work shown or described by the drawings and specifications, except upon a written order of the architects, and when so made, the value of the work added or omitted shall be computed by the architects, and the amount so ascertained shall be added to or deducted from the contract price. In the case of dissent from such award by either party hereto, the valuation of the work added or omitted shall be referred to three (3) disinterested arbitrators, one to be appointed by each of the parties to this contract, and the third by the two thus chosen; the decision of any two of whom shall be final and binding, and each of the parties hereto shall pay one-half of the expenses of such reference.

\*        \*        \*        \*        \*        \*        \*

" Article 8. The owner agrees to provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in the

event of failure so to do, thereby causing loss to the contractor, agrees that he will reimburse the contractor for such loss; and the contractor agrees that if he shall delay the material progress of the work so as to cause damage for which the owner shall become liable (as above stated) then he shall make good to the owner any such damage. The amount of such loss or damage to either party hereto shall, in every case, be fixed and determined by the architects or by arbitration, as provided in art. 3 of this contract."

Defendant's single plea denied causing delay to the plaintiff, and alleged full performance on her part, including the full payment of the price stipulated.

Cariolano Fontano, a brother of the plaintiff, proved the execution of the contract and admitted the payment of the sum stipulated therein. As recited in the bill of exceptions:

The witness further testified that upon his return to Italy in 1895, and after the signing of the contract, his brother immediately began the work on the stone preparatory to having the same ready to be set up in the chapel and completed within the time provided in the contract; that about March, 1896, a considerable portion of the cut stone was shipped to America, and that in June, 1896, practically all of the marble was cut and ready to be shipped to America, but, owing to the fact the plaintiff learned at that time that the walls of the chapel had not been completed, and that the roof had not been begun, the plaintiff did not forward the balance of the stone to America, as he was about to do; that as soon as plaintiff thus learned that said walls and roof were not completed he wrote at once to the architects requesting them to complete the same immediately, as he was ready to put up the marble, but no answer was received from the architects; that the plaintiff thereafter, between June and October, 1896, and afterwards wrote repeatedly to the architects urging them to complete the walls and the roof in order that he might complete the work as provided in the contract, but the plaintiff did not hear from the architects; that plaintiff was ready to begin the setting of the marble in June, 1896, and could have completed his part of the contract before October 1,

1896, had the walls of the chapel been put up and the roof put on; that marble can be set quicker in summer than in winter; that if he could have begun the setting of the marble in June, 1897, he could have completed the same within from two to three months; that the specifications which were made a part of the contract provided that the work of setting the marble should not begin until the walls were up and the roof on.

The witness was here handed the specifications and identified the same as the specifications furnished the plaintiff as a part of the contract. The specifications, which were introduced in evidence with the consent of the defendant and read to the jury, provide, among other things, as follows:

" The outside walls will be built, rough concrete floor finished and the chapel will be roofed in when the contractor commences to set marble-work. All brickwork supported on the columns of chapel will be done by owner's brickmasons at such times and in such manner as the contractor may require; the contractor must, however, keep these brickmasons under his supervision and so arrange that they shall do no damage to his finished work or materials on the ground."

" Should any dispute arise respecting the true construction or meaning of the drawings or specifications, the same shall be decided by the architects, and their decision being just and impartial, shall be final and conclusive."

" The contractor is to furnish all necessary materials, labor and transportations, and is to provide all tools, derricks, scaffolding, and all other necessary means, utensils, and appliances for properly prosecuting his work."

" Particular care must be taken by the contractor as the building progresses of all finished work, which work must at all times be covered up and thoroughly protected from injury or defacement."

The witness further testified that this incomplete condition of the walls and roof continued, and that by direction of the plaintiff he came to America on June 11, 1897, and went immediately to see the architects, Heins and La Farge, and told them that his brother has been delayed for nearly

a year in the erecting of the marble-work, owing to the walls not being up and the roof not being on, as provided in the contract and specifications, and urged the architects to put the walls up and the roof on immediately, so that he could begin his setting of the marble, and stated that a considerable part of the marble had been in Washington for over a year, and that the whole of it was now there ready to be put up; but the architects told him that there was no reason for his not commencing and performing his work as provided in the contract. The witness then told the architects that it was impracticable and impossible for him to do the work in the then condition of the walls and roof of the chapel without subjecting the marble-work to injury from breakage and stains; that the architects thereupon told the plaintiff to go down and try to set the marble to please Father Lee; that Father Lee had marble-work to give him if he would please in the performance of this contract. The witness thereupon informed the architects that he would come to Washington, and that he would see what he could do; that he came to Washington and examined the chapel and found that the level of the floor was two inches too low for the setting of his marble; that he thereupon notified the architects and shortly thereafter the witness was himself compelled to raise the steps and platform of the altar; that he found the walls, which were to be thirty-eight feet high, were only twenty-two feet up, and there was no roof on the chapel, as provided in the specifications. Witness was here shown a letter which he identified. The same was introduced and read to the jury. The letter is as follows:

" 725 19TH ST. N. W.

" WASHINGTON, D. C., 13th July, 1897.

" Messrs. Heins & La Farge, architects, Temple court, 7 Beekman street, New York.

" GENTLEMEN: Referring to my contract with Miss Mary Helen Carroll, under date of August 19th, 1895, relating to the interior marble finish of the chapel of St. Anthony of Padua in the church of St. Matthew, Washington, D. C.,

I take the liberty to call your attention, as Miss Carroll's architects, to the fact that it is impracticable for me to put up any of the work in said chapel in its present incomplete condition, which I am required by said contract to do, and it is utterly impossible for me to complete said contract until the walls of said chapel shall have been completed and the chapel placed under roof.

" I take the liberty to notify you that I have had all my material here for more than a month, ready to put up according to contract, and that I have been in Washington one month at heavy expense, waiting to perform my part of said contract, but have been delayed on account of the incomplete condition of the chapel.

" Very respectfully,

" PRIMO FONTANO,

" p. C. FONTANO."

Witness further testified that he had received a reply to his letter of July 13th, and the same was identified by him, introduced in evidence, and read to the jury. The letter is as follows:

" Heins & La Farge, architects, Temple court, 7 Beekman St., New York.

" JULY 16, 1897.

" Mr. C. FONTANO, 1725 19th St. N. W., Washington, D. C.

" DEAR SIR: We have your note of July 13th, in which you notify us that you can not go on with the marble-work of the chapel until the roof is on. We venture to differ with you in regard to your interpretation of the clause in the contract to which you refer, for two reasons:

" 1st. That it is entirely practicable to set your marble-work, so much of it, at least, as is necessary to support the masonry above which rests upon the marble.

" 2nd. When I visited Washington a week or so ago, at your request, we had agreed that you were to go ahead on this basis.

" We have, therefore, to request of you that you will carry out this understanding and commence to set the marble-work upon the outside walls, so far as may be necessary to support the brickwork above.

" Our interpretation of the clause in the contract which relates to setting the marble after the roof is on refers to the arcade between the chapel and the church and to the slabs lining the walls.

" We wish to call your attention to the fact that the general conditions printed on the specifications provide that the architects are to decide disputes arising respecting the true construction or meaning of the drawings or specifications. We are distinctly of the opinion that it will make a better piece of work to have the columns along the wall and the arches above them set in place before the wall is carried up any higher, as the inside lining wall can then be properly bonded to the outside wall, and the columns themselves can be anchored firmly in place. If you do not proceed as above, you will have to hold youself answerable for any damages which may occur through your refusal so to do.

" Yours very truly,

" HEINS & LA FARGE,

" per G. L. HEINS."

Witness further testified that he attempted to do the work and set in place several pieces of marble and some of the skirting, but that after working a day or two there was a heavy rainstorm which prevented him from further carrying on his work, for the reason that the water poured into the space between the marble and the brick walls, thereby damaging the cement and staining the marble; that he thereupon immediately notified the architects that it was impracticable for him to do the work until the walls were up and the roof on.

Witness further testified that he went to see Mr. George E. Hamilton, the attorney for the defendant, but found him out of the city, and that he was at the same time informed that the defendant was in Europe; that upon Mr. Hamilton's

return from Europe he called upon him at his office in this city and told him the condition of the walls and the roof, and that he had been here some time at heavy expense and urged him, as the attorney of the defendant, to have the walls erected and the roof put on, in order that he might go on with his work; that Mr. Hamilton told him that he did not know where the defendant was, but that he would write to her father and ascertain, and further told the witness that the plaintiff should suffer no loss on account of the delay; that he was compelled to wait around doing nothing until the latter part of August, 1897, when the witness was informed by Mr. Hamilton that the defendant was in New York; that on the 31st of August he saw the defendant at Coney Island, and that he told her that he was unable to set the marble, owing to the walls of the chapel not being up and the roof not being on, and that he had been here for some time at heavy expense, and urged her to have the walls put up and the roof put on so that he might go on with his work; that the defendant said that she could do nothing, that she had nothing to do with the walls or the roof, and disclaimed all responsibility for anything connected with the building of the walls or the roof of the chapel, and that witness would have to wait until the chapel was ready to receive the marble-work, and advised the witness to return to Italy until the chapel was ready, and that she further told witness that the plaintiff knew that she had nothing to do with the walls or the roof; that he told the defendant that he could not go back to Italy, as all his brother's capital was sunk in this job; that some time in September the work of completing the walls was begun, and that some time about the middle of October the work of putting on the roof was begun; that on the 18th day of October, the earliest day practicable, the witness began the setting of the marble in the chapel, and at that time a part of the roof was on — that part immediately above the point where he was setting his marble. Witness further testified that he was further delayed by the architects about a month in furnishing him with a diagram of the ceiling and the size of rosettes

for the doing of the decorative plaster-work on the ceiling of the roof; that on October 6, 1897, the witness wrote to the architects and requested the diagram of the ceiling, but did not receive the diagram as requested, and on December 9, 1897, again wrote to the architects for the diagram; the said letter, which was introduced in evidence and read to the jury, is as follows:

"1201 20TH ST. N. W.,
"WASHINGTON, D. C., 9th Dec., 1897.
"Messrs. Heins & La Farge, architects, Temple court, 7 Beekman St., New York.

"GENTLEMEN: The work on the contract of Prof. Primo Fontano in the chapel of St. Anthony of Padua, at St. Matthew's church, Washington, D. C., has progressed so far that it' becomes necessary to request that you forward at once to me the plans for the ceiling. Any delay in furnishing these plans will cause me considerable unnecessary expense, which I wish to avoid. You will recall that the price of this work was agreed to be $250.00.

"You will oblige me greatly by a prompt compliance with my request.           "Respectfully yours,
"PRIMO FONTANO,
"p. C. FONTANO."

That he again wrote to the architects on December 31st, calling their attention to the failure to provide the framework, including the lath to receive the decorative plaster-work. Said letter, which was introduced in evidence and read to the jury, is as follows:

"1201 20TH ST. N. W.,
"WASHINGTON, D. C., 31st Dec., 1897.
"Messrs. Heins & La Farge, architects, Temple court, 7 Beekman St., New York city, N. Y.

"GENTLEMEN: I have to inform you that I am now ready to put up in the chapel in the church of St. Matthew's the ceiling of decorative plaster-work called for in my contract with Miss Mary Helen Carroll under date of August 19th,

1895, and I have further to inform you that nothing has been done towards putting in place the frame-work, including the lath, to receive said decorative plaster-work, which you on the 16th instant promised me you would have done right away.

" You are hereby respectfully notified to have said frame-work and lathing put in at once and thereby save the expense to Miss Carroll that may result from my having to wait to have said framework and lathing put in.

        " Respectfully,         PRIMO FONTANO,
                 " p. C. FONTANO."

That on January 19, 1898, witness received the diagram for the decorative ceiling, and was also informed by the architects that the plaintiff would have to provide the framework and laths for receiving the decorative plaster; that, although witness did not consider that plaintiff had to provide the framework and laths to receive the plaster, yet witness did purchase and have put up the frame for this purpose in order to prevent further delays.

That the contract work was completed March 15, 1898.

He further testified to bringing a skilled workman from Italy to help him set the marble, and to the charges for his and witness's time and expenses while waiting; to extra custom-house storage charges upon the marble, and so forth, in support of the itemized statement of the plaintiff's demand. He further said that about the time of the institution of the suit he was told by defendant's attorney that she would not pay any damages or expenses sustained; but was not sure whether this was before or after the institution of the suit. He also testified, that it was impossible to set the marble in the chapel until the walls were up and the roof on; that the drippings of mortar and cement from the walls and ceilings would have stained and probably ruined his marble-work; that rain water on marble tends to discolor it, and that it is impossible to remove the same; that cement and lead are used in setting marble, and these likewise have a tendency to discolor it if rain water comes in contact; that

when he began setting marble in October, 1897, he found it necessary to take up and reset the pieces of marble he had set some months before, because rain had caused the cement to rot. On cross-examination, he testified that he knew Father Lee was building the chapel and church, and got from him a contract for putting two marble columns in the church; that he had never notified defendant personally about his claim, and that he had never consulted the architects or the defendant in regard to arbitrating his claim. He further said:

"That there was an inner and outside wall to said chapel, according to the plans; that the inner wall was to be built thirty-two feet high; that on top of the marble columns was to be brick masonry up to the roof; that the marble-work had to be carried up together for the reason that if the columns had been set in place it would have been impossible to set the marble slabs which lined the wall behind the columns, owing to the columns being required to be set very close to the walls; that he did not have room to work behind the columns."

Two witnesses, called for the plaintiff, testified that the walls of the chapel were not begun until some time during the latter part of September, 1897, and that plaintiff began setting the marble in October; that the roof was only partly on and was begun about the middle of October; that rain water tends to discolor marble and the stains cannot be removed. One of these witnesses had the contract for the brickwork of chapel and church, and the other was his employee.

On cross-examination, the contractor testified that his contract was with Father Lee, and the work was done under his directions and those of Heins & La Farge, his architects. Payments were made by Father Lee; that Miss Carroll was not known in the matter by the contractor, and gave no directions to him; that the work upon the brick walls would not interfere with or prevent the marble man from working, but it was not practicable to put in the marble-work before the roof was on.

On the conclusion of the plaintiff's evidence, the defendant moved the court to direct a verdict for the defendant, because:

1. The plaintiff's proof did not make out a case.

2. The plaintiff had failed to prove a reference to arbitration before bringing suit, which is a condition precedent to the right of action.

The motion was granted generally, and from judgment on the verdict so returned the plaintiff has appealed.

*Mr. Benjamin S. Minor, Mr. Joseph F. Collins* and *Mr. O. D. Barrett* for the appellant.

*Mr. G. E. Hamilton* and *Mr. M. J. Colbert* for the appellee:

1. The plaintiff's whole case rests upon the assumption that the defendant undertook and contracted to have the main structure and the chapel walls ready to receive the plaintiff's work and that she, the defendant, must be held to have agreed to do all the balance of the work upon the church building. Certainly Mrs. Robbins never intended to assume such a large responsibility, and certainly Mr. Fontano never so understood the extent of her responsibility. In June, 1896, when he learned that the walls of the building had not sufficiently progressed to receive his work, he made no complaint to her, but wrote to the architects who were employed and paid by the building owner. When, in August, 1897, he was informed by the defendant that she had nothing to do with the erection of the walls, he acquiesced in her statement, and made no claim at that time that he would hold her responsible for any damage which he might sustain by reason of being delayed in the prosecution of work under his contract. Even if we ignore the circumstances, and the plain understanding and conduct of the parties, and even if we ignore the conduct of the plaintiff in receiving from the defendant the full amount which she agreed to pay him without making a single claim against her for

anything more, and if we confine ourselves to the bald language of the contract itself, it would seem clear that the plaintiff's contention must fail. " The owner agrees to provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work." What labor and materials? Can it be said that by this vague and meaningless language the defendant bound herself to the plaintiff to have this entire building erected at her own cost and expense? We submit that from the terms of the contract itself no such conclusion is justified. We submit that the parties never so understood the contract, and that the plaintiff was expressly advised by the defendant that she assumed no such responsibility, and the plaintiff, by his silence, and by his subsequent conduct, acquiesced in this statement, and that he is now estopped from setting up the present claim against the appellee when she is powerless to protect herself.

2. It is not pretended that the plaintiff demanded or was refused any reference to arbitrators, and, under the decisions of this court and of the Supreme Court of the United States, it is too late to dispute the validity of such provisions requiring the submission of disputes of this kind to arbitration. *Bailey* v. *The District of Columbia,* 9 App. D. C. 360; *Wood* v. *Hartshorn,* 100 Mass. 17; *Kihlberg* v. *United States,* 97 U. S. 398; *Hamilton* v. *Insurance Co.,* 136 U. S. 242. See also *Railroad Co.* v. *Price,* 138 U. S. 185; *Avery* v. *Scott,* 8 Exch. 500; *Scammon* v. *Denio,* 72 Cal. 393; *Weggner* v. *Greenstine,* 72 N. W. 170; *Insurance Co.* v. *Long,* 73 Ill. App. 663. *Hamilton* v. *Insurance Co.,* 137 U. S. 387, relied on by appellant, is not antagonistic to the contention now made.

3. The only remaining contention on the part of the appellant is that, by refusing to submit to arbitration, the appellee has waived her right to demand it as a condition precedent to the bringing of suit. This contention is based upon a misconception of the proof in the record. According to the plaintiff's own showing, he did not arrive in this country until June, 1897. In August, 1897, long before he had

begun any work under his contract, he called on Mrs. Robbins and urged her to put up the walls, so that he could go on with his work, but Mrs. Robbins insisted that she had nothing to do with the walls or the roof, and that plaintiff knew that she had nothing to do with the walls or roof, and that was all that there was of the interview. In other words, the defendant insisted then, as she insists now, that, under a proper construction of her contract, she was not required to build the walls or roof of the chapel, but this was not a refusal on her part to ascertain and fix the amount of the plaintiff's loss by the mode pointed out in the contract after the plaintiff had completed · his work. On the contrary, the plaintiff's brother and agent says that he does not know whether it was before or after the institution of this suit that he was informed by Mr. Hamilton, Mrs. Robbins' attorney, that she would not pay for any loss or damage sustained by the plaintiff in consequence of the delay caused in finishing the walls and roof of the chapel.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. If the concluding clause of article 8 [of the contract] contained no reference to the action of any one but the arbitrators to be selected as provided in the last clause of article 3, for the ascertainment of the amount of loss and damage sustained by the plaintiff through the imposed delay, we could have no possible doubt of the plaintiff's right to maintain the action without precedent demand for arbitration. *Hamilton* v. *Home Ins. Co.,* 137 U. S. 370, 385. The provision for arbitration in that case was substantially like the one in the contract upon which this action depends. Unlike that in the prior case of *Hamilton* v. *Liverpool, etc., Ins. Co.,* 136 U. S. 242, it did not expressly declare that the award should be a condition precedent to the maintenance of an action upon the contract. It was, therefore, held, that the refusal of the plaintiff to submit the amount of his loss to arbitration, though promptly demanded, was no defense to his action. The distinction between the two

cases is thus stated by Mr. Justice Gray, who delivered the opinion in each:

"A provision, in a contract for the payment of money upon a contingency, that the amount to be paid shall be submitted to arbitrators, whose award shall be final as to that amount, but shall not determine the general question of liability, is undoubtedly valid. If the contract further provides that no action upon it shall be maintained until after such an award, then, as was adjudged in *Hamilton* v. *Liverpool, etc., Ins. Co.,* above cited (136 U. S. 242), and in many cases therein referred to, the award is a condition precedent to the right of action. But when no such condition is expressed in the contract, or necessarily to be implied from its terms, it is equally well settled that the agreement for submitting the amount to arbitration is collateral and independent; and that a breach of this agreement, while it will support a separate action, cannot be pleaded in bar to an action on the principal contract." 137 U. S. 385.

The language of article 8, however, is that the amount of loss or damage shall be fixed and determined " by the architects or by arbitration as provided in article 3." Turning to article 3, quoted above, it will be observed that it relates to alterations that may be made by direction of the architects, and the ascertainment of allowances therefor by them. In case of dissent from their award, submission shall be had to arbitrators whose selection and powers are provided for.

It is a well-settled doctrine that, in contracts of this general character, the parties may specially provide for the final ascertainment of the quantity of work done, materials furnished and so forth, by reference to the engineer, architect or party having supervision of the performance of the contract; and that his estimates and reports when so made will bind all concerned unless actual fraud can be shown, or the commission of gross mistakes from which bad faith might be inferred. *Kihlberg* v. *United States,* 97 U. S. 398; *Chicago, etc., RR. Co.* v. *Price,* 138 U. S. 185.

It is manifest that work and materials to be furnished in addition, or to be omitted, under the power given to the

architects, to make alterations from time to time, were, for special reasons, to be estimated by them. But instead of making their estimate final and binding, either party was at liberty, if not satisfied, to demand arbitration, and final settlement thereby.

It is contended on behalf of the appellee, that the provision of article 8 referring to this mode of ascertainment by the architects is a distinct and separate condition and binds the plaintiff, in accordance with the doctrine stated, without regard to the effect of the additional stipulation for arbitration in event of dissatisfaction; in other words, the architects are the sole primary judges of the amount to be paid, and the reference to arbitration is only by way of appeal from their judgment.

Whilst this contention is plausible and may be sound in application to demands arising under the alterations stipulated for in article 3, we are unable to agree with it.

The particular reasons for referring demands made by either party, growing out of alterations which the architects were empowered to direct, to what is called, in article 3, their award, do not exist in the case of demands made under article 8. The former demands accrue as part and parcel of the work to be done in the performance of the contract, in case of probable contingencies that might call for the correction of the plans and specifications in some minor particulars. The latter are by way of damages sustained through nonperformance of the entire contract within time. The recital of article 8, providing for determination by the architects or by arbitration, would seem to call, with certainty, for no more than a reference to the architects as arbitrators merely. So considered, the reference is no more a condition precedent to the right of action than is that to the other mode of ascertainment through arbitration. Special stipulations submitting the demands of a contractor to the adjudication of supervising architects and engineers, though enforceable as we have seen, are in derogation of common right and the ordinary freedom of action, and must clearly appear to be within the intention of the contract.

Construction, in case of doubt, is in favor of one resisting enforcement.

The conclusion reached renders it unnecessary to consider whether, assuming the correctness of the contention, the defense thereunder would be waived by denial of all liability before the institution of suit, or loss by failure to plead it.

2. It appears from the evidence submitted that the defendant was not in fact the owner or builder of the church or the chapel attached thereto. The pastor of the church had contracted for its construction according to the plans and under the supervision of the architects, Heins & La Farge.

The defendant, with knowledge of the situation and the approval of the church authorities, undertook to provide the interior construction of the chapel, and employed the same architects to plan and supervise the work for the execution of which she contracted with the plaintiff. The plaintiff's action is founded on the provision of article 8, to this effect: " The owner agrees to provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in the event of failure so to do, thereby causing loss to the contractor, agrees that he will reimburse the contractor for such loss." This is reinforced by the following clause of the specifications referred to in the contract: " The outside walls will be built, rough concrete floor finished, and the chapel will be roofed in when the contractor commences to set the marble-work." That the defendant was not the real owner of the exterior building and as such obliged to construct the same and furnish all labor and materials not included in the plaintiff's special undertaking, is a fact that has no material bearing upon the controversy. She is the person referred to as " owner " in the contract with plaintiff and as to him she assumed that relation for the special purposes of that contract. She took the place of the real owner, and, at least, became an absolute guarantor of the necessary construction preliminary to the commencement of plaintiff's work. He was not bound to inquire into her relation to the general construction of the

building, or her obligation to the contractors therefor. The argument that the plaintiff did not contemplate or understand this extent of responsibility on the part of the defendant, because he made no complaint to her in person of delay in the construction of the outer walls and roof, but complained, instead, to the architects who represented the real owner, is without substantial foundation. The architects of the building were also the architects, under the direction and to the satisfaction of whom, the plaintiff was to perform his part of the contract. They were to furnish the plans and specifications, interpret the same, supervise the work, direct changes, and certify to completion before final payment. They were the representatives of the defendant, and the correspondence between the plaintiff's agent and them shows on its face that his complaints were to, and his demands against them as such.

3. From the views expressed the conclusion necessarily follows that there was error in the direction to the jury to return a verdict for the defendant.

As the case must be remanded for new trial before a jury, we are not to be understood as expressing any opinion, whatever, in respect of the merits of the several items of plaintiff's claim of loss and damage.

All that we hold is, that under the interpretation given the contract between the parties, the evidence offered by the plaintiff was sufficient to require the submission of the issue to the jury.

The judgment will be reversed, with costs, and the cause remanded with direction to set aside the verdict, and award a new trial. It is so ordered.          *Reversed.*